UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR 07-118 CAS | | Date | January 5, 2009 |
|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | | |
| Interpreter | N/A | | | |

| Catherine Jeang | Laura Elias | Jason Gonzalez |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Carlos Serrano | x | | x | Liliana Coronado | x | | x |

| Proceedings: | **DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29(c), OR ALTERNATIVELY FOR A NEW TRIAL PURSUANT TO RULE 33** (filed 11/10/08) |
|---|---|

## I.   INTRODUCTION

On February 22, 2007, defendant Carlos Serrano was indicted for (1) conspiracy to commit bank fraud pursuant to 18 U.S.C. § 371; (2) bank fraud pursuant to 18 U.S.C. § 1344; and (3) criminal forfeiture pursuant to 18 U.S.C. § 982. Defendant was tried before a jury on September 9-12, 18, 2008, and found guilty on all three counts of the indictment.

On November 10, 2008, defendant filed the instant motion for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33. On December 3, 2008, the government filed its opposition. On December 22, 2008, defendant filed his reply. After carefully considering the parties' arguments, the Court finds and concludes as follows.

## II.   BACKGROUND

### A.   The LAX Meeting

This case arises out of defendant's business dealings with two Philippine nationals, Marilyn and Idelfonso Ong. At a meeting at Los Angeles International Airport ("LAX"), the Ongs offered to pay defendant an agent's fee of $25,000 to assist them in exporting goods to the Philippines. Kevin Chua and Irwin Jasminez were also present at this meeting. Defendant

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

agreed to assist the Ongs even though he had no experience exporting goods abroad.  Defendant agreed to act as an exporter in a $1.3 million loan transaction between MTC Optical, a company in the Philippines, and First International Bank ("FIB"), a lending bank based in Connecticut.  Defendant later admitted to United States Postal Inspector Wynter Kugel that he "thought there was something not quite right" with the LAX transaction.

On March 26, 2001, defendant submitted a commercial invoice to FIB certifying that he had sold approximately $1.3 million worth of United States goods to MTC Optical and that he had received a 15% down payment from MTC Optical totaling approximately $200,000.  Also on March 26, 2001, defendant submitted a packing list to FIB certifying that he had packed $1.3 million worth of United States goods into crates and shipped those goods to MTC Optical.  On April 11, 2001, defendant submitted an export-import bank supplier's certificate to FIB, in which he certified that the transaction was legitimate and that at least 85% of the goods purchased and shipped were made in the United States.  Based on these representations, FIB sent defendant approximately $1.1 million, which he deposited in a newly opened bank account.  Defendant then wrote three checks: one to himself for $28,000, one to co-conspirator Idelfonso Ong for $939,000, and one to Gerber Coburn Singapore for $160,000.  After these transactions were complete, defendant closed the bank account.

Defendant admitted at trial that he did not purchase any goods, that he did not ship any goods, and that he did not receive a 15% down payment.  Defendant further testified at trial that he believed Marilyn Ong had purchased $160,000 worth of goods from Singapore and then marked those goods up to $1.3 million.

### B.    Expert Testimony

Defendants sought to provide the expert testimony of Professor Antonio Tiongson regarding Filipino culture and, specifically, defendant's close bond and unique relationship with Mr. Chua, the man who introduced him to the Ongs.  In response to a pre-trial motion by the government, the Court excluded Professor Tiongson's testimony because it concluded that "the testimony of [a] 'cultural issues' expert would not be helpful to the jury in the resolution of defendant's guilt and would likely confuse the jury."  September 9, 2008 Order at 1.

Defendant also offered the testimony of Professor Gregory Bowman at trial, an expert in international finance and trade, who provided background information about the underlying transaction.  Professor Bowman testified that the type of transaction at issue in this case is complex, even for practitioners.  He further testified that this type of transaction is difficult to track and that there is a great deal of paperwork involved.  However, the Court did not allow Professor Bowman to testify regarding "the propriety of the documentation that he reviewed" or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

whether "he saw anything improper in the paperwork." RT 9/11/08 at 13, 15. The Court did not allow Professor Bowman to opine on the propriety of the documentation because "whether something is regular or irregular . . . is an ultimate fact for the jury" and because "there [was] no contention here that the paperwork was not consistent with a legitimate transaction." Id.

### III. LEGAL STANDARD

#### A. Federal Rule of Criminal Procedure 29

Federal Rule of Criminal Procedure 29(c)(1) provides that a "defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). In deciding a motion pursuant to Rule 29, a court must "review the evidence presented against the defendant in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Lobera-Valdovinas, 429 F.3d 927, 928 (9th Cir. 2005).

#### B. Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. A trial court has broader discretion to grant a new trial than to enter a judgment of acquittal. United States v. Kellington, 217 F.3d 1084, 1095 (9th Cir. 2000). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." Id. at 1097 (internal citations omitted).

### IV. DISCUSSION

#### A. Sufficiency of the Evidence

Defendant argues that a conviction pursuant to 18 U.S.C. § 371 requires proof of (1) an agreement to commit an illegal act; (2) at least one overt act in furtherance of the illegal purpose; and (3) the requisite intent to commit the substantive offense. Mot. at 10 (citing United States v. Carpenter, 95 F.3d 773, 775 (9th Cir. 1996)). Defendant further argues that if there is no meeting of the minds on a common purpose or design, no conspiracy can exist regardless of the defendant's criminal intent. Id. (citing United States v. Rubio-Villareal, 927 F.2d 1495, 1499 (9th Cir. 1991)). Defendant contends that the government did not introduce

any evidence that there was a meeting of the minds between him and the Ongs.  Id.  Defendant argues that with regard to the meeting at LAX, Inspector Kugel concluded that defendant "thought there was something not quite right with the transaction."  Id. (citing Exhibit B, 9/10/08 RT:42).  Defendant contends that this "hunch" falls far short of an agreement to commit an illegal act.  Id.

Defendant further argues that the government failed to prove that he had an agreement with the Ongs to commit bank fraud.  Id.  Defendant contends that, according to Inspector Kugel, Mr. Chua, and Mr. Jasminez, he did not discuss any of the details of a bank fraud transaction with the Ongs.  Id. at 11.  Defendant further contends that the only reference to a bank at the LAX meeting was Ms. Ong's reference to the "Ex-Im Bank," which he mistakenly thought was the "Exxon Bank."  Id.  Defendant argues that "the record is completely devoid of an agreement between [himself] and anyone else to commit bank fraud."  Id.

Moreover, defendant argues that the only disputed element at trial with regard to the bank fraud charge was whether he had the requisite mens rea.  Mot. at 12.  Defendant contends that the government's only evidence on this point is two statements that he made over five years after the offense, neither of which was conclusive regarding his intent to defraud at the time of the LAX meeting or at the time the loan documents were submitted to FIB.  Id.  By contrast, defendant argues that he submitted direct and circumstantial evidence, which proved that he had no knowledge of the Ongs' plan to commit fraud: (1) his testimony that his role was to facilitate the export transaction and that the Ongs spearheaded the transaction; (2) his testimony that he was not familiar with the intricacies of the transaction and that he engaged in activities consistent with an export transaction; (3) documentary evidence introduced by the government that Ms. Ong instructed him about the transaction and indicated several times that shipments were being made; (4) the testimony of several character witnesses that he is an honest, truthful, and law-abiding individual; and (5) the testimony of professor Bowman, who testified that the transaction was very complex and that defendant received a standard fee for the type and size of the transaction.  Id. at 12-13.

The government responds that there was "overwhelming evidence of Serrano's guilt.  Opp'n at 12.  The government argues that on the issue of mens rea, the only disputed issue, it provided evidence that defendant (1) admitted to Inspector Kugel that he knew something was "not quite right" with the transaction from his initial meeting with the Ongs; (2) knew from the initial email he received from Marilyn Ong that she was telling him to lie to the bank; (3) acted in concert with the Ongs throughout the transaction, including by carrying out their instructions; (4) used the fake name "Jay Reyes" with suppliers; (5) used the fake name "Frances Hilario" with FIB; (6) signed documents falsely certifying that he had bought and shipped $1.3 million in goods, and that he had received a 15% down payment; (7) wrote large checks to himself and

the Ongs after the transaction; and (8) initially lied to the case agent about his role in the transaction. Id.; Tr. Ex. 21.1. The government contends that this is more than enough evidence to support a finding of guilt. Id.

The government further argues that defendant's admissions on cross examination support a finding of guilt. Id. The government contends that defendant admitted that he thought the Ongs had actually purchased $160,000 worth of goods from one supplier in Singapore and then marked those goods up to $1.3 million. Id. at 13. The government argues that this admission shows that defendant was fully aware of the fraud in the transaction because he knew that no one had bought and shipped $1.3 million in US goods. Id.

Defendant responds that the government did not provide any evidence that he entered into an agreement to commit bank fraud. Reply at 2. Defendant argues that although he believed that the Ongs were gouging a company in the Philippines, that is not dispositive on the question of his state of mind because he did not understand the details of the transaction. Id. at 3. Defendant further argues that he trusted the Ongs and did not ask any questions because he believed that they were legitimate businesspeople who were familiar with this type of transaction. Id. at 4. Defendant contends that it is a "standard business practice for people to rely on their business partners, or employees, when conducting business." Id. at 5.

The Court concludes that jury's findings are supported by the evidence that was introduced at trial. Both parties agree that the only issue to be resolved at trial was whether defendant possessed the requisite mens rea or an intent to defraud. Given that defendant falsely represented to FIB that $1.3 million in US goods were being exported, the jury could have rationally concluded that he had an intent to defraud FIB. RT 9/11/08 at 142, 182-83. Furthermore, the jury's conclusions are bolstered by the fact that defendant used fake names, admitted that he knew something was "not quite right" about the transaction, and carried out the Ongs' instructions despite the fact that he knew he was making misrepresentations to FIB. This evidence also supports a finding that defendant had an agreement with the Ongs. United States v. Castro, 887 F.2d 988, 994 (9th Cir. 1989) ("The prosecution need not show that the agreement was explicit; it may be inferred from the facts and circumstances of the case."). Therefore, the Court denies defendant's motion for an acquittal, or, in the alternative, for a new trial.

### B. The Exclusion of Testimony by Professor Tiongson and Professor Bowman

Defendant argues that the Court's pretrial rulings excluding professor Tiongson's testimony and limiting the testimony of professor Bowman violated his "right to present his defense at trial." Mot. at 13. Defendant contends that the testimony of both experts went to his

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

state of mind, which was the sole disputed issue at trial. Id. at 14. Defendant argues that Professor Tiongson's testimony regarding Filipino culture would have provided context for his actions and for his willingness to assist the Ongs with what he believed was a legitimate transaction. Id. Defendant further argues that professor Bowman's proposed testimony regarding the inferences that could have been drawn from the paperwork in this transaction has a bearing on his state of mind because it corroborates his testimony that he was confused by the transaction and believed it to be legitimate. Id. at 14-15. Defendant contends that this excluded evidence was "critical" to his defense and that the Court committed error by excluding it and, in doing so, deprived him of his constitutional right to a fair trial and to present a defense. Id. at 15 (citing United States v. Rahm, 993 F.2d 1405, 1415-16 (9th Cir. 1993)).

The government responds that the Court properly excluded Professor Tiongson's testimony because the overall import of the proposed testimony was to show defendant's "state of mind . . . when he first met the Ongs . . . as well as throughout the transaction." Id. at 16 (citing Mot. at 5). The government argues that such "state of mind" testimony would have violated Federal Rule of Evidence 704(b), which prohibits an opinion or inference that a defendant did or did not possess the requisite mens rea.[1] Id. (citing United States v. Morales, 108 F.3d 1031, 1036 (9th Cir. 1997)). The government further argues that Professor Tiongson's testimony would have involved general cultural observations that would not have assisted the jury. Id. at 17. The government contends that defendant has lived in the United States for nearly 40 years and that any general cultural commentary as to how defendant, as a "Filipino," would have reacted to events would have been of dubious value. Id. The government further argues that Professor Tiongson could offer no specifics because he did not interview defendant. Id.

The government further argues that the Court properly limited Professor Bowman's testimony. Id. at 23. The government contends that the Court properly excluded Professor Bowman's testimony regarding the legitimacy or propriety of the transaction because that was an ultimate issue for the jury to decide and would not qualify as expert testimony under Fed. R. Evid. 702. Id. The government further contends that because it did not allege that the documents used in the loan transaction were fraudulent on their face, Professor Bowman's opinions regarding whether the documents appeared legitimate were irrelevant. Id. at 24.

---

[1] Federal Rule of Evidence 704(b) provides that: "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." Green v. Lambert, 288 F.3d 1081, 1090 (9th Cir. 2002). Although this right is not unlimited, a district court's application of evidentiary rules cannot be "arbitrary or disproportionate to the purposes they are designed to serve." Id. The Supreme Court has "found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." United States v. Scheffer, 523 U.S. 303, 308 (1998). District courts have wide latitude to exclude expert testimony and their decisions to do so are reviewed for abuse of discretion. United States v. Ortland, 109 F.3d 539, 544 (9th Cir. 1997).

The Court concludes that its exclusion of Professor Tiongson's proposed testimony was not "arbitrary" or "disproportionate." Scheffer, 523 U.S. at 308. The Court excluded Professor Tiongson's testimony because it determined that his testimony on cultural issues would not be helpful to the jury in the resolution of defendant's guilt and would likely confuse the jury. United States v. Sayakhom, 186 F.3d 928, 936 (9th Cir. 1999) (excluding testimony of expert on Laotian culture was not an abuse of discretion); United States v. Hoac, 990 F.2d 1099, 1103 (9th Cir. 1993) (excluding testimony of expert on Chinese culture did not amount to an abuse of discretion where expert's knowledge of defendant was limited and testimony would not have helped the jury). Given the support in the case law for the exclusion of Professor Tiongson's proposed testimony on "cultural issues," the Court cannot conclude that its ruling denied defendant a meaningful opportunity to present a complete defense. Lambert, 288 F.3d at 1090.

Similarly, the Court concludes that its limiting of Professor Bowman's testimony was not "arbitrary" or "disproportionate." Scheffer, 523 U.S. at 308. The Court allowed professor Bowman to testify that the transaction was complex because that issue required specialized knowledge. Fed. R. Evid. 702. However, the Court prohibited him from testifying as to whether the paperwork involved in the transaction appeared legitimate because that was a question for the jury to decide and because the government did not contend that the paperwork was defective. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993) (holding that the relevancy of expert testimony depends on whether it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."). Given the support in the case law for limiting professor Bowman's testimony, the Court cannot conclude that its ruling denied defendant a meaningful opportunity to present a complete defense. Lambert, 288 F.3d at 1090.

**V.    CONCLUSION**

In accordance with the foregoing, the Court hereby DENIES defendant's motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# CRIMINAL MINUTES - GENERAL

IT IS SO ORDERED.

|  | 00 | : | 10 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |

cc: Pretrial Services
    U.S. Probation